Ms. Pinares got kidney cancer and died because of her long-term exposure to toxins originating from Pratt & Whitney. Her experts, a toxicologist and other medical doctors, did exactly as this court has instructed and seemingly required in McLean, Chapman, and Williams, and that is because Dr. Wiley, a 40-year toxicologist, performed the hallmark of science of toxic torts. He calculated the dose-response relationship. He assessed dose-response. Judge Mara Below recognized that Dr. Wiley assessed dose-response. And because Dr. Wiley assessed dose-response, and the dose-response is a widely accepted methodology in toxic tort cases, Judge Mara's critiques of that dose-response went too far into a judge's gatekeeping role on Daubert. A judge has considerable leeway, no doubt about that, but that leeway ends at some place. Counsel, let me ask you, tell me what number that Dr. Wiley came up with as the toxicity for the TMHs or THMs, I always forget the acronym. So Dr. Wiley found that Ms. Pinares was subjected to a dose- That's a different question, because before you get to how much she ingested and how much she had, you have to determine, as I understand the dose-response relationship, what the dose is of toxicity for the drug in general for a human being. I don't understand it that way, Your Honor. So that's where I think we're maybe confused. So let's go to McLean, since McLean sort of set this out. McLean describes the dose-response relationship as, he does it a few times, but I'll quote two of them, whereas one, the scientific knowledge of the harmful level of exposure to a chemical, that's the general, plus knowledge that plaintiff was exposed to such quantity. And then later it says, a plaintiff must demonstrate the level of exposure that are hazardous to human beings generally. So what is the level at which a human being is going to be harmed by this? Because what McLean is at pains to say is that we ingest all kinds of stuff. And that which is not inherently toxic, and everyone agrees this case is not an inherent toxicity case, let me finish, has an allowable dose. That is the level between what's harmful and what's not. If I could, to respond to that, Your Honor, it's, the law does not require an expert to determine the lowest amount, a threshold amount, above which that is dangerous and below which it is not dangerous. You're right. But it does require the expert to, as I read McLean, and show me McLean where it says contrary to what I just said, it does require, it seems to me, a indication of what is toxicity for humans. And Dr. Wiley did that. What is that? And so. What did he say? Dr. Wiley said that the amount that Ms. Pinaras was subject to caused her cancer. Why? Because what he did was he calculated the amount that she was exposed to, the time that she was exposed to that time, to that toxin. But what's the level at which a human being is toxicity? Because not every, let me ask you this, if I have one drink of water from the same well that Ms. Pinaras was drinking from, am I, and I contract kidney cancer, is that toxicity from which I have been exposed to a level which can cause harm to human beings? That is not the question that Dr. Wiley was asked to answer, or that's not his opinion. Well, so okay, let's go there, because if you look at pages 27 and 28 of his report, this is at docket entry 471-7, he writes, quote, cancer initiation theories support the use of a one or two hit model as valid for specific chemicals under specific circumstances, and supports this toxologist in original report and this supplement in determination of low dose exposure to multiple toxic and carcinogenic chemicals. And he continues, quote, both qualitatively and qualitatively, it has been scientifically determined to be thus supported, the sufficiency of a biologically plausible dose response is sufficient to support a one or two or multi-hit model of a cancer initiation and promotion. What Dr. Wiley then does, especially in this report in 2016, is he talks about the infinitesimal amounts of hits that Ms. Pinaras actually had. So she had three, she was exposed to 3,000 micrograms of these toxins. Counsel, counsel, the problem is though, that in itself, the problem is McLean seems to suggest that that in itself isn't enough, because we all have exposure to some toxicity. There has to be a level that science supports, which says, if you drink that much, that is a level at which it can cause cancer or some harm in human beings. And Dr. Wiley said that the level that she was exposed to can cause it and did cause it for her. So what is the level at which it can? Where was the threshold? Well, he found that her risk was over three times the amount of background risk. That's her personal risk. I understand that. Where's the level at which, the number doesn't mean anything unless it's compared to something. It seems to be under the dose response relationship. No, he would say, Dr. Wiley would say that everyone in the acreage would be subject to this 3.6 increased risk factor, because everyone is, because everyone has well watered, right? Absolutely. But the question, as I understand the dose response relationship under McLean is, how do you compare that to what is, would be toxic? I understand they get 3.2 or 3.6 times more than anyone else in, in outside of Palm Beach County or whatever other the measurement is. I understand that. But that, that, and if it's that it could be an extra dose of Coca-Cola, that's three times six more. What is the dose of Coca-Cola that gets you to be toxic? The law does not require that threshold amount. So let's go back to McLean. If I, yes, your honor. And here's McLean scientific knowledge of the harmful level of exposure to a chemical. So Dr. Wiley presents the scientific knowledge of a harmful level for him. That harmful level in this case is the 3.6 increase rate. And then the next step in McLean is, but McLean sets out the test at page 1241 and it says a plaintiff must demonstrate the level of exposure that are harm hazardous to human beings generally, as well as the plaintiff's actual level of exposure. So he is, and we can talk about the actual number because I think there might be a problem with that too. But with regard to the dose level, what's the comparison? That's science. Background. So the EPA says that people consume two liters of water a day. And the EPA's judgment for that is based on drinking water alone. And I look back at Dr. Wiley's report and Dr. Wiley mentions that in his report. So it's not the case that Judge Maurer found that this is only based on Dr. Wiley's experience. So if we use the EPA level though, the problem as I understand it is the EPA has set a limit. And I think by the way, our case law has critiqued the EPA's numbers, but even taking the EPA as too conservative, frankly, but even it has, but even the EPA number, this was under for each of the individual chemicals, as I understand the record. We're mixing concepts. The EPA estimates how much water someone drinks a year, or someone drinks a day. That only is about drinking water. Dr. Wiley considered other routes of exposure to water. Then the EPA, then it's how much of these toxins are allowable in drinking water. That's a different standard. Right, I agree. That is not protective of health. Dr. Wiley critiques that. I'm not saying we have to use the EPA standard. What is the standard he used? Why is the EPA wrong? What is the appropriate standard to compare it against? It's specific to how much exposure the, in this case, Ms. Pinar has had. The problem is that only tells us one half of the equation. So there's two equations. There is, is this possible to cause this kind of cancer, which I think we have to talk about, too. Then how much of the toxic chemical, or the chemical, causes that kind of cancer? And then how much was the plaintiff exposed to? But Dr. Wiley did that. Dr. Wiley assessed the numbers. He puts down, he applies math, he has variables. He inserts a mathematical formula. He has real numbers that is patient, plaintiff specific. And in Williams, the expert there was criticized for not doing anything plaintiff specific. You have to take a look at the circumstances in this case for this plaintiff. It's not just in, it's not just in every- In footnote two of Williams, though, Judge Joflat is at pains to say that before you get to the specific, you still have to calculate a general number of toxicity for human beings before you get to the specific. In some cases, you can't just come up with a threshold amount and say, anything above that threshold, you're going to get sick. Anything below that threshold, you're not going to get sick. The law doesn't require that. That would be akin to saying, if a person who smokes- Can you show me in the law that it doesn't require that? We've certainly said you don't have to put an exact number. I agree. But there's got to be a band. There's got to be some indication that science says that this much, because what McLean is also at pains to say is that every chemical, or just about every chemical, has a perfectly fine usage rate. So where is the fine usage rate, and when does it become problematic? The facts on the ground matter. Two things to respond. How much overall water is Ms. Pinares exposed to, and how much, and what is the combination of the toxicants that she is exposed to? Both of those need to come into play. It's not to parse each toxicant out separately. Chloroform, bromodichloromethane, methylene chloride, that needs to be considered in the aggregate, because that's the soup. That's the toxic soup that she's exposed to day in and day out. So Dr. Wiley need not assess one toxicant at a time over that amount that she's been exposed to, over the length of time that she's been exposed to it. He does exactly what's appropriate. He does exactly what's required. If he didn't do that, then you would say, well, he's mixing concepts. If he didn't do that, he would say, he's not calculating from the facts on the ground. The facts on the ground is that she's subject to some low doses, but for bromodichloromethane, that dose is in excess of what the state of Florida deems to be an acceptable amount. So she is exposed to amounts in excess of that. And Dr. Wiley takes all of this into consideration. He does the calculations that is missing in Chapman. He does the calculations that never happen in McLean. So you have language in all of these cases, but what you don't have is the experts doing the act. Here, Dr. Wiley did the act. He calculated, he made the assessments, he calculated. I think that some of the critiques that Judge Mara had go to the weight and not the admissibility of the expert's testimony. Dr. Wiley applied what this court has said is a widely accepted methodology. He calculated dose response. Dr. Schechter also- Mr. Haberman, so your time's up? You've reserved some for rebuttal, and we'll hear from you again. Thank you, Your Honor. All right, thank you. Good morning. Morning, Your Honors. May it please the court, Dan McElroy for Appellee Pratt and Whitney. May I proceed? You may. I'd first like to congratulate you, Judge Martin, on a wonderful career. Unless the court would prefer otherwise, I'd like to start with specific causation. Obviously, the dose response assessment is critical to this case, and Judge Locke had some insightful questions to ask. But what I don't want to lose sight of is the fact that this circuit requires expert testimony on both general and specific causation. Can you answer my question? Sure. Your opposing counsel says that Dr. Wiley said that the amount that she drank was enough, and that that is enough under the law. Yes, and the case law makes clear that that's not enough under the law. Why not? An assessment of the dose response relationship requires, sort of crudely speaking, two things. One, you have to analyze the actual dose, what the actual exposure was for the plaintiff. But that by itself doesn't tell you anything about whether that dose is actually hazardous. You also need to assess, as McLean and Chapman and Williams all confirm, what the level that actually causes harm is. So McLean says it, as you pointed out, Judge Locke, and I- But Dr. Wiley says, I can't tell you exactly what that is, but I know that the amount that she had met that limit, because of the mixture of the three chemicals together. Right, and that's an ipsy-dixit. That's precisely what Daubert is meant to keep out. He says, I can't tell you how much is too much. Well, let me tell you what I find troubling about this case. Sure. I think that we have a number of things going on here. One of the things we have going on is a mixture of toxic chemicals. We have proof and evidence in the record that there is a known cancer cluster in the acreage. We have, and in this case, even though the cancer cluster goes to pediatric brain cancer and maybe some other things. In this case, we've got three different individuals who also live in the same area who have developed the same type of extremely rare cancer. We've got multiple carcinogens in, or of cancer and the promotion of cancer that are in the water here. And we've got chemicals that are sort of like forever chemicals. That is, they accumulate over time in the body. Why isn't it enough for Dr. Wiley to have explained that whatever the triggering, whatever the toxic level may be or may not be, that this certainly meets it? Why isn't that enough? Under those circumstances. Sure, a few points in response, Your Honor. So first of all, you're right that the cancer cluster here had to do with pediatric female brain cancers, had nothing to do with kidney cancer, and therefore isn't relevant. On the other hand, we do now have three of this extremely rare kind of cancer occurring in the same area. So- Sure. And one of the other experts has designated that a cluster as well. So, I mean, I think it's kind of hard to ignore that evidence. Well, so there are a couple points in response to that, Your Honor. One, it's not an extremely rare type of cancer. Kidney cancer is one of the more common types of- This particular type of kidney cancer. And this particular type, renal cell carcinoma is the most common type of kidney cancer. So the notion that it's extremely rare is not accurate. The fact that there were three is irrelevant with more analysis. Dr. Danoff didn't say how many, he couldn't say how many he would expect- Let me ask you a question. In this- Is it accurate that about 16 times more, there was the incidence of about 16 times more cancer in employees of Pratt and Dunn in the general population, that is 1 in 624 employees as opposed to- 1 in 624 instances of cancer as opposed to 1 in 10,000? So a lot of that is based on hearsay, and that is not actually supported by the record, in part because there hasn't been any expert, that has to do with something that happened 40 years ago. There hasn't been any expert- But even so, we all know that the groundwater travels from there to the acreage. I mean, there's been some expert evidence about that as well. There's been expert evidence that suggests that they claim that it can travel. That evidence is actually not reliable, but that's not before this court. There hasn't been any- How do you think all the people in the acreage are suffering from the same kinds of issues, and the same chemicals that were found at, right at the Pratt and Whitney site, are also found at the acreage, if they didn't travel there? I'm glad you raised that, actually, Your Honor, because the chemicals at issue here, so trihalomethanes is sort of the primary thing at focus here. It is a ubiquitous type of substance. Trihalomethanes are in everybody's drinking water across the country. So ubiquitous, in fact, that trihalomethanes are present in Palm Beach County's water at much higher levels than what was found in Ms. Penares' well. What was in her well is a fraction of what is in Palm Beach County water, because it's a common- Nation of chemicals in water all over the United States, or even in Palm Beach County, as you do in the percentages and the types that you have in the acreage. Well, I suspect that what you might be referring to, Your Honor, are things like dioxins and furans. And those are things that plaintiff's counsel has mentioned in briefing, and that Dr. Schechter focuses on. Those are chemicals that were never, have never been found in Ms. Penares' well. Trihalomethanes and methane chloride are the only things that have ever been found in her well. And what's more, the hydrogeologist in this case explicitly said that he cannot say if there would ever be dioxins and furans in Ms. Penares' well, even if it was present at homes around her. He hasn't done any analysis to be able to say that that's the case, and even more. So even if we could set that aside, that there's no evidence whatsoever that this was ever something that Ms. Penares was exposed to, nobody has attempted to do any type of dose assessment, dose calculation, dose response assessment with regard to anything other than trihalomethanes and methylene chloride. So it's unfortunately, I don't want to call it a tactic, but throughout plaintiff's brief, there are all sorts of contaminants discussed that are completely irrelevant to Ms. Penares' case. Cuz there's zero evidence that she was ever exposed to any of it. I do want to focus though on, your questions sort of are geared toward Dr. Danoff's assessments and opinions. And he is one of the two people that plaintiff has put forward to give a specific causation opinion. And this court has made clear that a plaintiff to survive summary judgment needs both general and specific causation. Here, those are the only two experts that are supposed to present a specific causation opinion. That means that even if Dr. Wiley's opinions were reliable, which they are not. If Dr. Danoff and Dr. Schechter didn't put forth reliable testimony, then the summary judgment order is well founded and this court should affirm it. And I want to talk about why there are three different reasons that this court should affirm the exclusion of those specific causation experts. The first, well let me back up. Plaintiff claims that those two experts conducted what's called a differential diagnosis. They didn't- Ruling things out. Excuse me? Ruling everything out. Well, ruling it out but also ruling in. You need to rule in the cause you blame and rule out everything else. They didn't actually perform that methodology and that alone, by itself, is sufficient to affirm the district court summary judgment. So I want to make three points about that. The first, plaintiff claims in briefing that they did conduct a differential diagnosis, but doesn't provide any citation to the record. I have to tell you, counsel, just backing up a little bit. I know with regard to Dr. Schechter, that there is a footnote reference to a problem with the differential diagnosis. Yes. So I think with the him, I think regarding him, your argument's well taken. But while we do affirm for different reasons than the district court that are supported by the record, I have to say in this kind of context where it's really fact specific, I'd feel very uncomfortable ruling on a Daubert issue that was not addressed by the district court in the first instance. Because of how complicated and deep the record is, how well you both have litigated this case. That seems to ask a lot of an appellate panel to do when the district court didn't pass at all on that. And at least with regard to Dr. Danoff, I don't see any reference to a differential diagnosis issue. You're right that there's no explicit reference to differential diagnosis. But what there is a reference to is a failure to do two things. One is to properly assess background risk. The district court did say that. That's one step that this court has said is necessary if you're gonna perform a differential diagnosis. And the other, more importantly, is the court explicitly talked about Dr. Danoff's failure to either do himself or rely upon an assessment of the dose response relationship. That too is a necessary step. The problem is though a lot of this seems to rise and fall on Dr. My questioning there. If we disagree with you and agree with your opposing counsel on Dr. Wiley, that undercuts a lot of the district court's reasoning. Maybe not all of it, but a lot. So I think you've hit on a critical point, Your Honor. The summary judgment ruling doesn't actually hinge on what this court thinks about Dr. Wiley. And that's because, as I said before, specific causation testimony is necessary. And that means that Dr. Schechter and Dr. Danoff, one of them at least, needs to have given a reliable opinion. To do so, this court has been crystal clear, most clear in Williams, they need to do an assessment of the dose response relationship. They didn't do so whether or not Dr. Wiley's assessment is- Why do they need to do it? I'm not sure that I read Williams in that way. I mean, it is not infrequent that experts sort of silo themselves into different things. And that's because expertise is siloed. So there's a toxicity expert that is very different from someone who deals with the kidneys, and you wouldn't expect one to do with the other. Why can't the kidney doctor rely on the dose-response relationship, assuming it's done properly and consistent with both Daubert and Rule 702, to rely on that person's dose-response relationship? Judge, you're 100% right that experts can rely on one another. And what they could have done is rely on somebody else to do a dose response. They could have said, okay, this other toxicologist has done this dose-response assessment. I'm gonna rely on that and assume it's accurate, and then I'm gonna go on and do the rest of my analysis. They didn't do that here because the dose-response assessment didn't exist when they reached their conclusion. I'm just not sure that matters. I get why the district court made that, and it doesn't look great, frankly. But whether it existed or not, they could say, I assume the toxicity. In other words, I assume general causation. My opinion is limited to specific causation. And if they had done that, and assuming their opinion is, again, Dr. Wiley's is fine, I don't see how we would not reverse under those circumstances. So let me read you a quote from Williams, this court's precedent. It says that under either category, and by either category, they mean either general or specific causation, an expert still needed to perform or rely upon a methodologically sound dose-response assessment specifically relevant to the plaintiff. So the point is, one of the things that a specific causation expert has to do is rule in what he or she is blaming for the injury that the plaintiff suffered. In order to do so, in order to say, I know that it's THMs, so I've ruled out all these other things, and the way I can rule in trihalomethanes or methylene chloride. The way I can do that is by assessing the dose-response relationship and understanding that she was exposed to enough. That's how you can reach the opinion that I, expert, can say specifically what caused this person's injury. And that's why it really does rise or fall on whether Dr. Wiley conducted a proper or consistent or reliable dose-response relationship. And I don't think that's right, Your Honor, because at the time that they reached their conclusion, they didn't have any dose calculation. They didn't have any assessment of the dose-response relationship. So in essence, we'd be saying that they guessed right. They guessed right, and then later, somebody else might do some analysis to show that their guess was accurate. And that's not a cognizable way to operate under Daubert and under this court's precedent. I'd like to say one other thing about this 3.2 number. Plaintiff's counsel in briefing in today has said that Ms. Penares had 3.2 times the background risk of renal cell carcinoma. And that's not what Dr. Wiley said. That's simply not accurate. What Dr. Wiley was apparently talking about was some agency's investigation of the possibility of health problems in the acreage or contamination that could cause health problems. And the agencies all concluded the same thing, that there wasn't any health risk in the acreage due to environmental contamination. Dr. Wiley criticizes that and says that for a couple of reasons, the risk that people would face would be 3.2 times what agencies might say because of some of their default rules about how much water people are exposed to and an apparent, a supposed failure to take into account compounding effects of multiple chemicals. None of that is actually supported by any analysis. He intuits, for instance, that there's double the risk because of multiple chemicals being present without any support. But more importantly, it's simply an irrelevant calculation. For one, it doesn't have anything to do with background risk of renal cell carcinoma. Background risk doesn't factor into that calculation in any way, shape, or form. And number two is something that, Judge Luck, that you hit upon. It doesn't say 3.2 times what. It doesn't establish any actual risk. It doesn't help in any way to establish how much is too much, as McLean and Chapman say. So this 3.2 number is not in any way helpful in assessing the dose response relationship and in helping Dr. Wiley's opinion pass muster under Dauber. So I can see my time is coming to an end here, your honors. So I guess I'd like to reiterate that there are multiple grounds upon which this court could affirm the district court's summary judgment order. Dr. Wiley's opinions are not, do not rely on a reliable foundation. Neither do Dr. Danos or Dr. Schechter's. And either of those findings are sufficient to affirm the district court's summary judgment order. If you have nothing further, I'll rest. Thank you. Thank you. May it please the court, to jump back into where we left off. If the answer to the question of, was Ms. Pinares' exposure enough to increase her risk? Then logically the answer to the question of, is there an amount in general that is sufficient enough, is met. It's plaintiff specific. The law requires a toxicologist to do a rigorous analysis of what the plaintiff is exposed to, and that's where the toxicologist failed in Williams. And that's where we succeed here, in this case, because Dr. Wiley did what is required. To respond to my colleague's comments about specific causation, both Dr. Schechter and Dr. Danoff do what the law requires to meet specific causation. They both performed differential diagnoses. They're both valid differential diagnoses. Dr. Danoff is a 40 year urologist at Cedars-Sinai, founded the urology program there. And he testified how that kidney cancer is a rare cancer. Where did Dr. Schechter, the one where there is the footnote regarding differential diagnosis. Where did he specifically rule out and explain why he ruled out obesity and hypertension, which as I understand it, there's some evidence that the plaintiff suffered from. That happened after she had kidney disease. Hypertension is because of the kidney disease. Did he, in his report, does he rule any of that out? I can't, I don't recall off the top of my head if he ruled that out. But, I mean, he did consider her medical. Is your point that if she didn't have hypertension and obesity until after she had cancer, the hypertension and the obesity couldn't have caused the cancer? No, your honor, there could be more than one factor of causation. I guess what I'm asking is, if something happens, if these other things, the obesity and the hypertension, did not happen until after she was diagnosed with cancer, then they couldn't have caused the cancer, is that right? Well, that's true, your honor. Okay. That's true. And in this case, these doctors looked at her medical records, so they were familiar with the medical history. And there are alternative causes that were considered unexplained. Other causes could be smoking. Ms. Pinaros was a non-smoker. Other causes could be an exposure to other industrial contaminants. The only industrial contaminants at issue here that Ms. Pinaros was exposed to were the ones in her well water from Pratt & Whitney. So both of these doctors do a valid and complete differential diagnosis. And I agree, Judge Luck, with what you said earlier. Judge Maher didn't reach this issue below. His order primarily rested- Well, with regard to Dr. Danoff, I mean, he does make a finding. It's, I agree, brief in Dr. Schechter's order. But with regard to Dr. Danoff, he does not mention differential diagnosis. Right, and our position is both doctors did perform a valid differential diagnosis. What about, your opposing counsel asked you about the background factors that, in other words, you have to show what the background risk is for the same thing in the community as part of the differential diagnosis. Was that done by Dr. Schechter? Yes, I'm gonna, yes, Dr. Schechter and Dr. Danoff both do background. I don't have off the top of my head the record site of where Dr. Schechter does the background risk of kidney cancer. But Dr. Danoff talks about it in his deposition and about the rarity of kidney cancer, especially when there are three cases of renal cell carcinoma all diagnosed around the same time. All very much close together, as Your Honor pointed out, Judge Rosenbaum earlier. And so I submit respectfully that the proper course here would be to reverse Judge Mara on Dr. Wiley. Dr. Wiley did what the law requires. And there's not a case where the toxicologist does the calculations, does actually perform a dose response by examining what the facts on the ground were that that expert toxicologist has been excluded. It's the cases where the experts don't do it, or it's where the experts just rely on one article, as in Williams. This is not Williams. And so because Dr. Wiley did what's required under the law, it should go before a jury. This is a question of fact before the jury to raise. Judge Mara overreached on Daubert, and we respectfully submit that you reverse. Thank you. Before you all, before we move on to the next case, you can be seated. I've thought a lot about this case, and as you can tell, my colleagues have as well. And I'm always reminded of a speech Justice Breyer gives. And he says, there's never a 100% right answer to these cases, because if there were, we wouldn't have them, right? And I know that it's an expensive proposition to I am, at the end of the day, if we have to reach an opinion, I don't know how that would come out, but either of you might have a lot to lose, however the opinion comes out. This morning, I think the excellent questioning by my colleagues points out maybe some shortcomings in both of your cases. And that goes again to what Justice Breyer says, it's probably not a 100% right answer for this. And so I would like to send this case to mediation. I understand you may have already tried to mediate it. But having heard from the panel this morning about maybe the respective weaknesses in each of your cases, it seems to me a fresh look would be good. The 11th Circuit has a mediator that we engage for this purpose. And I don't know if there's any reason not to. Like I said, I need another vote from the panel to do that. But that's what I'm going to be trying to do. So maybe you all could agree to further mediation. I don't know if you haven't had time to think about that. But I've passed that along for what it's worth. And obviously, I need to have a conversation with my colleagues about it. But this is a serious case. And a family has lost a member. And then from the plaintiff's side, the law and experts is tough for plaintiffs in the 11th Circuit. So I don't know how it's going to turn out. I'd like to send it to mediation. And I just wanted to let you know that before we conclude with this case. So thank you. By the way, if you all agree for it to go to mediation, if you let us know, that would be great, too. Thank you.